The next case is Mueller v. PNC Bank for the appellant, Mr. Bartolacci, and for the appellee, Ms. Hogan and Mr. Runyon. Have you split your time? Yes, I have. Okay, thank you. You may proceed. Thank you. May it please the Court, there is one inescapable fact which I think the trial court's order ignores and for which I think the plaintiff's appellees really have no answer. And that is, with the policy, the Lincoln policy in effect, if Frederick Mueller dies any time in the immediate future, Trust 1397, the trusted issue in this case, would receive the $10 million death benefit, which is a sum that far exceeds the amount of the $1.4 million surcharge that the trial court ordered when it suggested that we should get rid of that policy. And it dwarfs any amount that that sum could, that $1.4 million sum could reasonably be expected to earn in the market or other investments. So, regardless of whether that decision ultimately, to purchase the policy was ultimately found to be prudent or imprudent, as of this time, nobody's been damaged yet. We don't know ultimately if the trust is going to be harmed by the decision to purchase that policy. We can't know that until Fred passes away. The plaintiffs have challenged the prudence of that decision. Basically, primarily their evidence was based on projections, which they claim demonstrate that there's a possibility that the trust might someday run out of money, that the policy might therefore lapse and have no assets available when Frederick dies. Of course, that hasn't happened yet. If it does happen, they may very well have a good, solid lawsuit, but that has not occurred. When might it happen? In the next year or two? Well, of course, none of us know when our time is up. Fred has... Well, I mean, when would the trust run out of money? In the next year or two, right? Their projections, I believe, were, their most aggressive projections, which have some issues, were 2016, that it would run out of money in 2016, which would be four years from now. There are some issues with that projection, which I'll address in a bit, that I think fails to take into account some other assets that were available to the trustees to fund premiums. But even under their scenario, they should be able to keep the policy in effect for another four years. Now, I'm not here to tell you that Fred will die in four years. We don't know. While it's possible, it's not a certainty. The bottom line is, until he passes away, nobody can know whether any of these predictions will come to pass, whether or not, you know, what steps the trustee might take in the intervening years to manage the cost of the policy, and in the end of the day, whether the trust was better off or worse off for having acquired this policy as an investment. There are a couple of particular factors about this trust, which I think significantly bear on this issue, the fact that there's not yet been any damage. The first is, you know, the evidence was replete about the fact that this trust initially was set up, along with some other trust department overall plan by the grantor, to enable the party to avoid having to sell the trust stock in the Mueller Company. Of course, the company ended up being sold for other reasons in 1986, and all of the trust Mueller Company stock was replaced with the proceeds of that sale, which then had to be invested in some way. So to the extent that the grantor's initial intent was to preserve the family business, well, that went by the wayside. It's been moved. But the trust didn't terminate. The trust continued on. And so the trustee had to manage the trust going forward without that overriding purpose any longer being in play. And there are a couple of factors that make it different than other trusts that I have dealt with in the past, and seen, and first, this trust doesn't terminate until Frederick dies, so the life of the trust is indeterminate in the sense that it's tied to the life of Fred Mueller, which is not unusual in and of itself. But while Fred's alive, there is no income beneficiary. There's nobody to whom the trust currently must pay income. In addition, there's no right to encroach on principal. Typically, you'll see an encroachment provision that says you can invade the trust for someone's health or maintenance or support. No such provision. So until Fred dies, there are no interim needs for distributions of income or principal out of this trust. There are no beneficiaries who are entitled to receive the money. So that leaves the primary, really the only goal left for the trustee in managing these trust assets is capital appreciation. What investment strategy will yield the greatest amount of money at the end of the trust at Frederick's death? And what they've chosen is they've used this life insurance policy. What the trial court finds is they should not have done that. They should have invested it in the market. And as I say, until Fred dies, we really don't know which strategy is going to work out to the best, and the trust hasn't been damaged until it's time to distribute the assets, and we know how much is there for distribution to the ultimate recipients. I said there's no loss. In essence, the trial court's order would force the loss, because what the trial court's order does is instead of letting this, to use a colloquialism, instead of letting the strings sort of play out and see what happens and see if there's actually any damage to be addressed here, the trial court sort of forced the issue. It basically said we have to get rid of the policy, which would in a sense lock in whatever damage or loss there might have been at this time. In doing that, I think the trial court improperly substituted its judgment for that of the trustee who's charged with managing these assets. The general role of the reviewing courts in reviewing a trustee's administration of the trust is limited to determining whether a breach has occurred and imposing any appropriate relief to regress that breach. A breach of fiduciary duty by a trustee, like any other negligence or similar claim, requires a duty, requires a breach of that standard of care, and actual damages. Again, the problem we have here is there are no actual damages. Did the trustee breach the terms of the trust when he did not purchase a term policy or an ordinary life policy, but instead he purchased a variable universal life policy? No, Your Honor, he did not. And that was the next thing I wanted to address, because there are two different reasons why the trial court cited it as a basis for a breach. One, and they're kind of intermingled, one was the assertion that the purchase of this policy violated the Prudent Investor Act. That was one set of arguments. The other was the question you just raised, which was essentially the trial court found that this was an unauthorized class of asset, that aside from any other aspects of prudence, the trust instrument in this case did not permit the purchase of this type of insurance policy. That was the finding of the trial court. We believe that finding is just dead wrong for a couple of reasons. First, without belaboring the point, because I know you're very familiar with the record of the breach, the trust itself obviously has a preference for insurance. If you read the terms of the documents, it says, acquire as much insurance as feasible, the maximum amount the assets will allow. It does state a preference for insurance over other types of investments in the first instance. Several places the document says the trustee must buy either ordinary insurance or term insurance or both. And so what the trial court concluded, based on expert testimony, was that ordinary insurance meant only whole life insurance. It didn't mean any other type of variable policy or other type of product that the insurance industry might have devised. I think everyone agreed in the trial court that in 1966, when the trust was written, variable life insurance policies did not exist. There were essentially only two types of life insurance product available, term life or whole life. In essence, well, also, there's no question that a variable life policy would not violate the prudent investor statute. The reason that the trial court found this to be an unauthorized investment was that he found that it violated the terms of this particular trust instrument. And of course the idea, as you know in interpreting a trust instrument, is to ascertain the intent of the grantor, what he would have intended. So the issue for the trial court to ascertain, assuming there were an ambiguity, is what was the grantor's intent when he used the word ordinary insurance. So I mentioned there were only two types of insurance in 1966 readily available, term or ordinary insurance. The testimony largely was recognized that ordinary insurance was often used in the industry synonymously to mean permanent insurance, which in essence was juxtaposed against term insurance. Another legitimate definition of the testimony for ordinary insurance is not term. There's ordinary and there's term as those words were being used in 1966. In essence, when Frank Mueller's trust said you could buy term or ordinary insurance, the trust wasn't setting out a restriction on what you could buy. It essentially said you could buy any kind of insurance product available. Those were the only types of product available on the market. The experts all testified that nobody knew what Frank Mueller, the grantor, necessarily meant by that phrase. So they were trying to ascertain that based on common usage in the industry. The testimony was that from Mr. Malachowski, who is the plaintiff's expert, he testified on cross-examination that the industry defines ordinary insurance as not term insurance, that variable insurance is a type of permanent insurance, which is considered also ordinary insurance, that his own personal definition of ordinary insurance as meaning only whole life was his personal definition and it differed from industry publications that he considered authoritative, such as the American Council of Life Insurance. And finally, he admitted that he had no idea what the grantor meant by the use of that term. So the evidence before the trial court, first of all, I don't believe that the instrument was ambiguous. When the instrument said you could buy ordinary insurance or term insurance, there was no reason to think that the grantor meant to exclude the variable life insurance product, which wasn't in existence at that time. He essentially authorized the purchase of any kind of life insurance available at the trustee's discretion. The life insurance industry devised the variable insurance product, I think in the 90s, to sort of address some concerns about investment options. And the big difference between the variable policy and the whole life policy is the variable policy unbundles the cost of insurance from the investments, and they end up investing the investment portion of the premium that exceeds the cost of insurance in an array of mutual funds offered by the insurance company, so that the owner of the policy gets to control the investments rather than the insurance company. That's one of the big differences between the two types of policy. Could the benefit ever exceed $10 million? No. I don't know of this particular policy. Normally, the way variable policies work, you have a guaranteed death benefit. If you build up cash value, you get one or the other, whichever is greater. So I don't know if there had been a cash value buildup in excess of $10 million. I think that would have been the only way you could get over $10 million. The death benefit would not exceed $10 million on this particular policy. So the advantage of using this kind of policy is the $10 million level? If you'd used a different kind of policy, maybe you couldn't have gotten $10 million. It would have been... Well, there were a couple issues about this policy. Frederick Mueller has some significant health issues, and so they were able to get a $10 million policy. Typically, the testimony of the experts were, you would seek the higher death benefit because you can always reduce it if you need to to reduce the cost of insurance, but it's hard to go back up with somebody who has insurability problems. So the death benefit can be reduced as a tool to manage the policy should the trustee decide to reduce the cost of insurance by reducing the death benefit. They could drop it down from $10 million. $10 million is the maximum. It can't go higher, but it could drop. I believe the lowest it could drop would be to $5 million. That has to do with the terms of the policy and the tax laws about deferred income that are built up inside these types of policies. So $10 million is the maximum death benefit available. Should future events dictate that the trustee wants to reduce that death benefit to control and reduce the cost of premiums, should they look at their projections and the funds available to the trust and decide that's the way to go, they could drop it down to as low as $5 million and reduce the cost of insurance that way. The last point that I wanted to make about the trial court's reasoning about why ordinary insurance couldn't mean variable insurance was that the trial court's order makes the point that in a whole life policy, the insurance company bears the risk. And that's referring to the risk of the investments. So in a whole life policy, you just pay the insurance company the premiums they control how it gets invested. And in the variable life policy, you control the investments, which means you live and die with their performance. If the investments don't work, it falls on you. So one of the distinctions that the trial court drew between a whole life and variable was this bearing the risk of the investment performance. Now, that really makes no sense as a distinction in this context in light of the relief that was granted. Because the relief that was granted was to take all those assets that were put into the policy and put them in the market and bear the very same risk with which he was taking issue in his order. If it's not in the policy and it's in the market, those assets are clearly subject to market risk, as anybody who's in the market knows. But they're subject to market risk without the added benefit of a potential $10 million death benefit of the termination of the trust. So to the extent that the trial court thought that the market risk of a variable policy was somehow significant, certainly the relief doesn't eliminate that risk. It only exacerbates it. And so I think that's an illogical basis to draw the distinction that the court drew. So for those reasons, I think the court's conclusion that this life insurance policy was not an asset authorized by the trust instrument finds no basis in the wording of the trust instrument itself and ignores really the testimony from both experts on the insurance industry and what those terms, ordinary insurance, mean and the common usage in the insurance industry. So whether this is a question of law, which I still believe it is a question of law, or whether it's a factual question, I still think he's erred either way. Because if it's a factual question, the trial court ignored significant testimony that bore on this issue that really only leads to the one conclusion that variable insurance is ordinary insurance. So either way, I think that that conclusion is erroneous and is not a valid basis for the court's order, which leads us into the question of whether the purchase of the Lincoln policy complies with the Proven Investor Act, which I would turn to next. Before you get to that, let me ask another question. If you stop paying premiums on this policy, does the policy lapse? Yes. Now if the policy had had cash value built up, which it did for a while, the death benefit would last, but you would still have the cash value. But what the trustee did in 2001, it began paying just the cost of insurance and it used the cash value built up in the policy between 2001 and 2004 to fund those premiums. So for that three-year period, there were no cash outlays from the trust to fund the premiums. The policy paid for itself. But by 2005, that reserve was largely used up. But one alternative is to reduce the benefit under the policy and that reduces the premiums? Yes. So on the prudent investor issue, was this a prudent decision to purchase the policy? I believe the burden. There were some issues about whether the plaintiffs even had standing to seek an accounting and get from Phase I to Phase II in this case. I haven't addressed that initial ruling in the briefs or in the argument because largely the issue sort of moved. I mean, they got the information. They got their accounting. They know what happened. So the real issue now is the surcharge and what relief should the court impose now that the plaintiffs have gotten their accounting. But even though the trial court found a crime-efficient case and let the parties move to Phase II, the burden remained on the plaintiffs in Phase II to prove that the purchase of the Lincoln policy was a breach of fiduciary duty. The basic law still is a trustee is presumed to have acted properly and in good faith, and the burden is on the plaintiff to show they breached their duties and somehow damaged the trust. The factors that I mentioned earlier about there not being any damage yet are also very pertinent to the whole issue of the prudence of acquiring the policy in the first place, and those factors are that there is no income beneficiary, no encroachment rights, and that the trustee is investing for capital appreciation only. And those are factors that the trustee is required to take into consideration when coming up with an investment strategy, that the outlook for the horizon of the trustee, short-term, interim distribution needs, and they need to invest for those purposes. Again, here, the trustee's only goal is to take an adequate risk to generate the proper amount of capital to be distributed to the ultimate beneficiaries when Frederick passes away. The trial court's conclusion that it was imprudent to buy the policy rested primarily on its acceptance of these projections that we discussed, that the trust would run out of money to pay premiums. But that ignored several critical factors. First, it's impossible to know how much longer Frederick's going to live. Projections are just that. There's a reason that securities laws make these companies put on their projections that little disclaimer that projections are no guarantee, because they're not. Until the events come to pass, projections are just projections. I would note that the record demonstrated significant health issues for Frederick, which make it sort of questionable for the plaintiff's expert to use standard mortality rates to presume that he's going to live the same number of years that those of us who aren't wheelchair-bound and chronic smokers and alcoholics have. But no one knows who's right about that. But the most important factors that the trial court and the plaintiff's expert ignored in assuming that the trust is going to run out of money are alternative sources. And I alluded to it earlier, there were separate trusts set up for each of Frank Mueller's sons, Philip, Michael, and Frederick. And then there was a fourth trust, this Trust 1970, as referred to. And there were assets available in Trust 1970 to fund insurance premiums to the extent that the assets in Trust 1397 might be insufficient. And, in fact, that's the purpose of Trust 1970. It states that those assets are to be used by- Time's up, counsel. Thank you very much, I appreciate it. We'll have additional time for rebuttal. Thank you. Ms. Hogan? Thank you, Your Honor. Good afternoon, judges, counsel. Thanks for the opportunity to address the court today. Emily and Frank Mueller are the only grandchildren of the grantor, Frank Mueller, in this case. Now, the first argument of PNC Bank is that damages in this case aren't speculative, nor are they premature. They certainly are not speculative, and they are certainly not premature. Standard review is whether the reward of damages is against the manifest weight of the evidence. The judge heard multiple days to hearing process about the Lincoln policy purchase. At the first phase, we had approved sufficiently to the judge that there was waste and mismanagement of the assets because my clients are contingent remainder beneficiaries. We met that burden. So we had a second phase, and we were entitled to the account statements, which we got the account statements for all four trusts because this is a system of trusts. And, in fact, when I get to Trust 1970, there's an additional reason, in addition to what PNC Bank has argued today as to why the Lincoln policy was not a good purchase. In fact, it was against both the trust directive and the investor rule. At the second phase hearing, using the account statements for all four trusts, Dan McGuire, the plaintiff's expert, who's an accountant, simple math, the investments for all four trusts were essentially the same. And so he was able to determine the loss in Trust 1397 by comparing all the trusts to where it should be versus where it was. Now, when you talk about the Lincoln policy and the value of the Lincoln policy and the $10 million value, you have to look at what happened with the Lincoln policy at the end of the day. It is no more than an expensive term insurance policy. It's nothing more than that because of how it was managed. But going back to the damages in this case, they're identifiable. They're identifiable in the September 29th orders, just over $1.4 million. And what the judge said is at the end of the day, after the appeal process, after he's allowed this process of having the policy shot because their expert said it was worth something, and then in addition to looking at possible sale to Fred Mueller, getting Fred Mueller's medical records because, frankly, the medical records don't establish any difference really from 1999 standards when the policy was issued at a standard rating with a smoking notation. There's no indication in the record that Fred Mueller is any different medical today. He did have a bout with alcoholism, a relapse in 2005, but there was no change according to what we have, what the evidence in the case was from that time regarding his medical condition that would shorten his life. The trustee's argument that damages are premature because Fred Mueller is still alive is not persuasive. There is damages that are very real, not speculative. $1.4 million is the difference between where the trust should be and where it is today. When the Lincoln policy was purchased, Fred's life expectancy exceeded Trust 1397's ability to pay, and that is what you look at from 1999 when the policy was purchased. That is one of the violations of the trustee's duty. It did not have sufficient funds for Trust 1397 to pay the policy premiums through the maturity date, so it was an improved purchase for that reason alone. So the damages are not against the manifest weight of the evidence. The trial court was right in there. They haven't argued about the contingent beneficiaries. It's quite clear that the contingent beneficiaries are represented in this case, and I'll stand on our brief as they apparently stood on theirs. Now, getting down to the meat of this is the purchase of the Lincoln policy was contrary to the trustee. No, the trustee could have purchased the term policy. Could have. Which term policy for 10 years, 10 years expired, no benefit. Well, it would have been substantially less money, Your Honor. The other thing was that after the sale of the Mueller stock, one of the trustee's directives under the Approved Investor Rule, let alone common sense, is what's the best investment. Now, with the Mueller and the history of this trust, and what the trustee had in the records indicated what there was testimony to from Michael Mueller is that the trustee recognized that after the sale of the Mueller stock, as Mr. Bartolucci said, one of the purposes of the system of trust was to protect the Mueller stock in the event of the death of one of the sons, so they wouldn't have to sell the stock to pay estate taxes, essentially. So when the Mueller company sold, that went away. So then the question from the trustee would be what's the best investment. So the trustee met with Michael Mueller and Philip Mueller. Fred was in rehab at that time in 1986 when the company sold. They met and discussed this issue, and they decided, and there's testimony in the records on this, and it's also in the briefs, they decided that the trustee wouldn't purchase life insurance because it wasn't the best investment, that growth was the charge after the sale of the Mueller stock, growth of the investment, and that would be stock. And that's what they did for a period of 13 years following the Mueller stock sale. Despite this inflow of money from the sale of the stock, no life insurance was purchased. That was not unintentional. That was clearly intentional, and it backs up what Michael Mueller said. When was this policy purchased? Policy was purchased in 1999. Okay. Now, Frank Mueller, and the record clearly shows he was the kind of guy that, he was an engineer by trade. He ran Mueller Company. He was an amazing person, actually, and he planned these trusts. He was older. He was getting near retirement in 1966 when he planned the trust. Not only did the trust show how they're supposed to operate, but he left the trustee explicit instructions. Besides conversations, he left letters saying, here's how it's supposed to work. And then in 1966, he had no grandchildren when he created this. Emily and Frank were born in the 70s, 72 and 74, I think. Right before that, he looked at this. He saw, because of some sales of Mueller stock, the price of the stock had gone up, and he created Trust 1970 to make sure that his system previously created would work. And there's indications in the record of what he planned, and it was to protect the sale of the Mueller stock, and it was identical, as much as possible, equal shares to his son's descendants. That was the purpose of Trust 1970, which was called the Equalizer Trust. So anyway, getting back to the Lincoln Policy, and I'll come back to Trust 1970. Getting back to the Lincoln Policy, the trusts were created at the same time. Each of the trusts has similar language and directives. Each of the trusts were funded with Mueller stock in proportion to the amount needed to initially fund the first life insurance policy based on the disparate ages of the kids. Philip was 20 years older than Fred. Michael was five years older than Fred. So there was a spread between the oldest and the youngest son. So the trusts are set up where Philip's house needed more money to fund it because he was older. And in fact, there's a provision in Trust 1399, which is Philip's trust, that addresses that at Philip's death, is that an additional sum of money goes to the other two trusts to make up for it having initially, first, a larger proportion of stock. The reason for that was, again, scrupulous desire to have three equal trusts for the benefit of each of his son's descendants. And it was a very important thing to Frank Mueller. That's shown in the record. Let me ask you about the trust, the language, which seems to me to be very broad. It says the trustee can buy term or ordinary life. That doesn't sound very restrictive to me. That sounds like you can buy whatever you want to. And, Your Honor, that's right. If you take ordinary life definition to be what Mr. Bartolucci said, the expert testimony was different. John Malachowski did not say that ordinary life would include. Ordinary life is whole life, right? Well, ordinary life is whole life. It seems to me you're talking about both ends of the spectrum or whole life. Well, yes, but a variable, flexible, universal policy is much different than whole life, Your Honor. First of all, it has a securities component to it. You have to give the buyer a prospectus. You have to be a sophisticated investor in order to purchase a Series 6. You have to have a Series 6 license in order to sell a variable life, flexible, universal policy. It has a greater risk to it. And the trust also said the goal was to obtain the maximum amount of insurance possible. Right. Isn't that saying you can buy whatever kind of insurance you want to, I want you to get the maximum amount possible? Your Honor, that's not what it says. You can't buy whatever kind of insurance. It has to be ordinary return. That's both ends of the spectrum, though. Well, that was both ends of the spectrum in 1966 when you talk whole life. When you talk variable universal life insurance policy, it's a whole different animal. What that is is a far riskier investment, frankly, Your Honor. I went and looked in Black's Law Dictionary, and it says ordinary life insurance, one, life insurance having an investment-sensitive cash value such as whole life insurance or universal life insurance. Well, that's Black's Law Dictionary. The industry has different definitions, one of which, as Mr. Malachowski said, was that the risk was one of the major considerations. Who bears the risk? And from the standpoint of this trust, the risk is important, and the trial court found that to be true. The risk was important. You're putting $10 million policy and the trust's entire assets at risk with the purchase of this $10 million policy. So the risk and the big – let's go back to 1999. Isn't there a risk with buying a term policy? You buy a term policy, it only lasts for a certain period of time. The insurer is still alive. Bang, you've lost all your money. Well, Your Honor, that's true, but there is also a difference in price between a term policy and an ordinary, especially a flexible, universal life insurance policy. The difference in price is what is at issue here. Because how life insurance works, as I'm sure you know, that's not term, is this component, this investment component, and the risk of the building up in it. With a whole life policy, for instance, take this policy. The assumption, the policy assumption, the Lincoln policy for the rate of return was 9%. In 1999, and John Malachowski, the plaintiff's expert, testified to this, in 1999, interest rates were about 9%, but historically, that was a high interest rate. So in that, again, in retrospect, you see that that's actually true, that 9% was not a sustainable insurance, I'm sorry, interest rate, rate of return over time, that policy. It's not how it panned out, and it really wasn't going to be how it panned out, because interest rates fluctuate. Now, the other component of this, and I don't want to use up all my time about that. The other component of this, Your Honor, is if you look in 1999 when the Lincoln policy was purchased, you have to look at what assets were in Trust 1397. The trust directive requires that as well. It was, you have to look at the net income and unrestricted principal to see if you could afford to buy the policy. And the case was, at that time, and as Mr. Bartolucci recognized, there's no income beneficiary, so the income has been accumulating in this trust for 46 years at this point, and it was accumulating that trust. That's even more of an obligation of the trustee to make sure, without an income beneficiary and without a direct beneficiary overseeing this, that the choices they make are good choices. It's a prudent investor rule, and follow the trust directive. Anyway, in 1999, the trust balance was about 1.7, I think it was 1.747, 1,747,000. Simple math would lead you to understand that at the time of that purchase, it did not have sufficient funds in Trust 1397 to carry that policy through maturity. And in fact, even more telling on that are the actions of the trustee beginning, as Mr. Bartolucci said, in 2001 and forward. First of all, they pretty quickly quit paying the scheduled premiums. They depleted the cash asset value, and they started paying monthly cost of insurance. Now, they never admitted that was because they realized the policy was too great, but it's clear from the record, the totality of the facts in this case just make that so clear. And following up with that, just looking at those steps from 2001 to 2005, following up in 2005 on their own. This is when Michael Mueller, our client's father, just found out that this large policy was purchased and started asking the trustee questions. But prior even to that, they started looking for solutions to fix the Lincoln problem. And the problem was that policy cost exceeded or would exceed what was in the trust, if you carry it to maturity. They started looking to sell it to Mr. Mueller. They started looking to shop it on the third market. Did Fred's attorney suggest this policy? Yes, and that's another thing. In 1997, prior to the trustee buying the policy, Mr. Volpe floated the idea to the trustee of how about buying insurance. And at the time, the then trustee representative said, well, we'll consider it. Send us at least three quotes. Well, they had a couple of changes. It became the buying of the banks, and a new trust representative was there in 1999. Mr. Volpe this time didn't call or make a suggestion, didn't send the quotes. He just sent a policy partially filled out, said sign it, send in the premium, and we'll have this policy. In 1997, his suggestion was a $3 million policy. In 1999, he submitted a $10 million policy. The trustee reviewed the policy for all of, I think, three weeks before it was mailed back with a check. And their testimony from Mr. Perkins at trial shows the limitations of what he actually did. And, in fact, for what he did say, the trial court found him, as the judge put it, incredible. I think that means he didn't believe his testimony. But anyway, the, I'm sorry, I lost my train of thought. Was Fred's attorney acting improperly? Well, you can make a suggestion to the trustee. It's up to the trustee to determine the investment. Was he representing Fred and the family's best interests when he made that suggestion? Well, Your Honor, one of the things about the suggestion wasn't so much the attorney. It was the selling agent. The selling agent was Dawn Litchfield. Dawn Litchfield is Fred's financial advisor. And, in fact, since, for the last several years, she's also been taking care of his daily activities. Dawn Litchfield got a commission from the seller of the $10 million policy to the trustee. So that is a concern. That is something the trustee should have looked at when it was sent. In addition to just doing the due diligence that's required of the trustees when purchasing a $10 million policy that's different from any policy existing in any of the trustees. If the trustee in 1999 had bought a $1.7 million, had spent $1.7 million single premium term life policy for 10 years, would that be a violation of the trust? Probably under the prudent investor rule. And possibly under the trust because 10 years, at that point, Fred Mueller's life expectancy was beyond 10 years, Your Honor. So to spend all your money on one 10-year term policy that's taking it was essentially, excuse the expression, a crapshoot. Which I would argue that the Lincoln policy is as well. But basically, I would question the prudence of that investment too. Whether they could do it is not just the trust directives about purchase of term insurance. It's how much money is in the trust and what is the prudence of the investment under both the trust directives and under the prudent investor rule. The trust talks about the trustee's sole judgment and discretion. Yes. Doesn't the trustee have some discretion here? Of course. But the trustee is also required to use a prudent investment rule, in good sense, in making decisions on investments. And again, the trustee in 1966 was given this responsibility by Frank Mueller. It was going to be a long-term responsibility. And that was one of the things that you definitely need to look at from the terms of a trustee is how long is this going to last? How long is, what's the prudence of the investment? What does the trust term say? And in the totality, I see I'm running out of time. In the totality of the circumstances here, Your Honor, this was a bad investment. There was no due diligence. Very, very limited due diligence. While Fred Mueller is still alive at this point, the judge is exactly right to make the determination here. There's damages, and the best investment is not the Lincoln policy. I didn't get a chance to talk very long about the gross negligence and reckless indifference. But I would also say, we set it out in our brief, that in the totality of the circumstances here, the trustee's actions all the way through this beginning in 1999 and forward, Your Honor, it shows a pattern that I'd really like the court to look at. Because I think that's one error the judge made here, is that he was loathe to charge punitive damages in this case. And I think if there's ever a case, and especially with a fiduciary, breach of fiduciary duty, for gross negligence and reckless indifference, the trustee didn't seem to pay any attention. We never argued willfulness or wantonness in terms of an intention. What we argued is they paid so little attention to this, because it had been around a while, because they didn't see it for what it was, which was Frank Mueller's legacy to his grandchildren. And they just didn't pay enough attention here, made a number of mistakes. Instead of fixing them, instead of being forthright, they played hide the ball, they lost more money, and they made bad decisions, Your Honor. And that, frankly, is, at the end of the day, the point of this lawsuit, is this needs to be fixed and the trustee needs to fix it. Thank you, counsel. There is one thing I need to correct in response to your earlier question, Justice Cook. This particular policy you asked about, could it exceed $10 million in a matter of reference to building up cash value, because I understand this policy. You could build up cash value within the policy, but at the end of the day, the company kept that cash value and the owner of the policy got the death benefit. So the $10 million was the maximum that could be achieved in this policy. The only real advantage to letting cash value build up is you could use it to reduce the cost of insurance and pay premiums. So there is a countervailing argument that why let the insurance company have the cash value if the trustee, who is, after all, a professional investor, thinks they should be better than the mutual funds available through the insurance policy. So I just wanted to clarify that response to your question. Let me ask you another question. Why would the trustee buy the insurance policy in 1999 after the company's stock was sold in 1986? Well, in 1999, it was presented as an investment. It was obviously not done to preserve Mueller Company stock. It was presented as an investment that the trustee agreed to purchase. Now, it was presented, as you noted, by Mr. Volpe, who was Mr. Frederick Mueller's attorney. It was done on Frederick Mueller's behalf. So maybe I shouldn't be paying so much attention to the language of the trust, because that's all up in the air. The only question now is, was this a prudent investment? I think yes and no. I think you're right. The primary question is, is it a prudent investment? But the Prudent Investor Act does provide, among the factors that the trustee has to consider, any particular instructions of the grantor. Now, the trust instrument does have its preference for insurance. It does direct the trustee to purchase the maximum amount of insurance. The testimony was that that was principally designed not to have to sell Mueller Company stock. But the trust carried on after the sale of that stock. I mean, it could have been easy to remove those. I mean, I've seen trust instruments remove those kind of restrictions in the event that the company gets sold. That was not the case with this trust. So the trust instrument is not irrelevant in 1999. It still professes a preference for insurance, but I would agree with you that the Prudent Investor Act in 1999 is applicable to the decision. The other thought I wanted to finish was, in 1999, the plaintiff's theory is, when they look at the funds available to fund the policy, and they're looking at Frederick's life expectancy, they're simply taking the premium and calculating it by the number of years until it exceeded the $1.7 million in Trust 1397. Those calculations don't take into account that they're going to earn additional income on those assets. It doesn't take into account the roughly $2 million in Trust 1970, or the little bit more than $3 million that was in Phillips Trust. Now, there was no guarantee that we were going to get Phillips Trust, but as it turned out, Phillips, in fact, did die with no descendants, and half of Phillips Trust goes to Trust 1397. Those assets are also available to fund premiums if the policy stays in force. So when the plaintiffs run these projections and say, we're going to run out of money by 2016, they're ignoring these other sources of assets to fund the premiums. Just briefly on the argument about punitive damages, I would note that none of the cases cited in the plaintiff's brief for punitive damages even involve a trustee's breach of fiduciary duty. They're normal tort kind of cases. The law generally, if you look at cases on punitive damages, the law generally is the trustee is not punished with punitive damages unless there has been some kind of self-enrichment. If there was a self-dealing where the trustee essentially stole from the trust or enriched themselves, just negligently performing their duties does not give rise to a punitive damage award. Certainly on this case, there's no evidence of any self-enrichment by PNC, and we think even if ultimately it was determined that the decision to purchase the policy was found to be in violation of the Prudent Investor Act, it's not like this was an obvious black and white mistake. There were many factors that supported that decision. So even if they guessed wrong in your judgment, there's no basis for punitive damages. And I think that that part of the trial court's decision was correct. Thank you, counsel. I take this matter under advisement and stand in recess until the readiness of the next case.